**18SL-CC03319**

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

## IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
## STATE OF MISSOURI

| | |
|---|---|
| BOBBY D. ALLRED; WILLIAM ANNANDONO; SAMUEL V. BARE; MICHAEL BARR; STEVEN BENEDICT; MAZOLA BLACKMON; JO ANN BONO; JOE L. BOSWELL; TROY W. BOYDE; MICHAEL G. BREE; RONNIE BROWN; TERRANCE BURTON; DOUGLAS CALDWELL; RONALD CARNES; MICHAEL CHAIKLIN; RODNEY CHAMBLISS; LOUIS J. COGNATA; JAMES A. COLE; DANIEL COX; JAMES E. CROSS; CHARLES DINNIS; JEFFREY DRACH; RODNEY DUNHAM; MARCO K. FEJES; DAVID FLYNN; JULIE FOWLER; KNOLTON GANT; JOHN GORACZKOWSKI; JON GRADY; DANA S. GROSS; THOMAS G. HENDRIX; JAMES HINSON, individually and on behalf of, MARY HINSON; PATRICIA HOFFMAN, individually and on behalf of, BERNARD HOFFMAN; GEORGE HORSTMANN; DONNIE B. HUMPHREY; ROBERT JOHNSON JR.; JOHNNY JORDAN; RICHARD W. KING; DEBORAH S. KOCKA; GRACE LAUGER; MARCIA LEHMANN; JOANNE LEIFHEIT; JANE WOODY; JOAN YANNI | Case No.: <br><br> Division: <br><br> **JURY TRIAL DEMANDED** |
|        Plaintiffs, | |
| v. | |
| MONSANTO COMPANY <br> Serve:  Registered Agent <br>        CSC of St. Louis County, Inc. <br>        130 South Bemiston Ave., Suite 700 <br>        Clayton, MO 63105 | |
|        Defendant. | |

## <u>PETITION</u>

COME NOW Plaintiffs, by and through their undersigned counsel, and for their causes of

action against Defendant Monsanto Company, alleging the following upon information and belief

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

(including investigation made by and through Plaintiffs' counsel), except those allegations that pertain to Plaintiffs, which are based on personal knowledge:

## INTRODUCTION

Plaintiffs bring this cause of action against Defendant pursuant to Rule 52.05(a) of the Missouri Rules of Civil Procedure, as their claims arise out of the same series of transactions and occurrences, and their claims involve common questions of law and/or fact. All claims in this action are a direct and proximate result of Defendants' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of the products as Roundup®, which was conducted without regard to individual Plaintiff differences.  All Plaintiffs in this action seek recovery for damages as a result of developing Non-Hodgkin's Lymphoma ("NHL"), which was directly and proximately caused by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and the attendant effects of developing NHL.  No Plaintiff knew of an association between exposure to Roundup® and the increased risk of developing NHL until well after the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), first published its evaluation of glyphosate. All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' exposures to Roundup®.

## THE PARTIES

### PLAINTIFFS

### Bobby D. Allred

1.      Plaintiff Bobby D. Allred is a citizen of the State of Alabama and was born on May 2, 1940.  Plaintiff Allred resides in the City of Cullman, County of Cullman.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

2.     Plaintiff Allred was exposed to Roundup® in Bremen, Alabama from 1978 through 1992 while spraying Roundup® at his farm.  Plaintiff sprayed Roundup® every year from April through September, on a bimonthly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Walmart, and Tractor Supply Company.

3.     Plaintiff Allred was further exposed to Roundup® in Cullman, Alabama from 1992 through 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through September, on a bimonthly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Walmart and Tractor Supply Company.

4.     On July 19, 2017, Plaintiff Allred was diagnosed with NHL in Cullman, Alabama by James Hoover MD, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

5.     As a direct and proximate result of these injuries, Plaintiff Allred has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Allred has otherwise been damaged in a personal and pecuniary nature.

6.     During the entire time that Plaintiff Allred was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

3

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

**William Annandono**

7.      Plaintiff William Annandono is a citizen of the State of Ohio and was born on December 13, 1952.  Plaintiff Annandono resides in the City of Painesville, County of Lake.

8.      Plaintiff Annandono was exposed to Roundup® in Cleveland Heights, Ohio from 2001 through 2006 while spraying Roundup® at his parents' home.  Plaintiff sprayed Roundup® every year from April through October, two to three times each week.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at various local hardware stores.

9.      Plaintiff Annandono was further exposed to Roundup® in Munson Township, Ohio from 2007 through 2014 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through October, two to three times each week.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Walmart and True Value.

10.     Plaintiff Annandono was further exposed to Roundup® in Painesville, Ohio from 2015 through 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through October, on weekly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at various local hardware stores.

11.     On April 17, 2013, Plaintiff Annandono was diagnosed with NHL in Cleveland, Ohio at Cleveland Clinic, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

12.     As a direct and proximate result of these injuries, Plaintiff Annandono has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Annandono has otherwise been damaged in a personal and pecuniary nature.

13.     During the entire time that Plaintiff Annandono was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Samuel V. Bare**

14.     Plaintiff Samuel V. Bare is a citizen of the State of Florida and was born on August 2, 1971.  Plaintiff Bare resides in the City of Palm City, County of Martin.

15.     Plaintiff Bare was exposed to Roundup® in Middlesex County, Virginia from 2012 through 2015 while spraying Roundup® occupationally.  Plaintiff sprayed Roundup® every year from June through August, on a monthly basis.  Plaintiff wore gloves and a mask while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself. Plaintiff was supplied Roundup® for use by his employer.

16.     Plaintiff Bare was further exposed to Roundup® in Middlesex County, Virginia from 2012 through 2015 while spraying Roundup® occupationally.  Plaintiff sprayed Roundup® every year from June through August, on a biweekly basis.  Plaintiff wore gloves and a Tyvek Suit while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Home Depot and Walmart.

17.     On August 7, 2017, Plaintiff Bare was diagnosed with NHL in Stuart, Florida at Martin Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

18.     As a direct and proximate result of these injuries, Plaintiff Bare has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Bare has otherwise been damaged in a personal and pecuniary nature.

19.     During the entire time that Plaintiff Bare was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Michael Barr

20.     Plaintiff Michael Barr is a citizen of the State of North Carolina and was born on August 18, 1975.  Plaintiff Barr resides in the City of Mount Airy, County of Surry.

21.     Plaintiff Barr was exposed to Roundup® in Mount Airy, North Carolina from 2011 through 2016 while spraying Roundup® at his church.  Plaintiff sprayed Roundup® every year from April through September, on a twice monthly basis.  Plaintiff wore a mask and gloves while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Wal-Mart.

22.     Plaintiff Barr was further exposed to Roundup® in Mount Airy, North Carolina from 2011 through 2016 while spraying Roundup® at his grandmother's house.  Plaintiff sprayed Roundup® every year from April through September, on a twice monthly basis.  Plaintiff wore a mask and gloves while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Wal-Mart.

23.     Plaintiff Barr was further exposed to Roundup® in Mount Airy, North Carolina from 2011 through 2016 while spraying Roundup® at his home.  Plaintiff sprayed Roundup® every

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

year from April through September, on a twice monthly basis. Plaintiff wore a mask and gloves while spraying Roundup®. Plaintiff used both premixed and concentrated Roundup®, which he mixed himself. Plaintiff purchased Roundup® for use at Wal-Mart.

24.     Plaintiff Barr was further exposed to Roundup® in Mount Airy, North Carolina from 2011 through 2016 while spraying Roundup® occupationally. Plaintiff sprayed Roundup® every year from April through September, on a twice monthly basis. Plaintiff wore a mask and gloves while spraying Roundup®. Plaintiff used both premixed and concentrated Roundup®, which he mixed himself. Plaintiff purchased Roundup® for use at Wal-Mart.

25.     On or about June 16, 2016, Plaintiff Barr was diagnosed with NHL in West Salem, North Carolina at Forsyth Oncology, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

26.     As a direct and proximate result of these injuries, Plaintiff Barr has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Barr has otherwise been damaged in a personal and pecuniary nature.

27.     During the entire time that Plaintiff Barr was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Steven Benedict**

28.     Plaintiff Steven Benedict is a citizen of the State of Ohio and was born on March 9, 1958. Plaintiff Benedict resides in the City of Youngstown, County of Mahoning.

29.    Plaintiff Benedict was exposed to Roundup® in Minneapolis, Minnesota from 1974 through 1976 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through August, two to three times each month.  Plaintiff occasionally wore gloves while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Lowes, Ace Hardware, Menards, Home Depot, and Walmart.

30.    Plaintiff Benedict was further exposed to Roundup® in Hennepin and Dakota County, Minnesota from 1976 through 2005 while spraying Roundup® occupationally.  Plaintiff sprayed Roundup® every year from April through August, on a monthly basis.  Plaintiff occasionally wore gloves while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Lowes, Ace Hardware, Menards, Home Depot, and Walmart.

31.    Plaintiff Benedict was further exposed to Roundup® in Youngstown, Ohio from 2005 through 2015 while spraying Roundup® occupationally.  Plaintiff sprayed Roundup® every year from April through August, on a monthly basis.  Plaintiff occasionally wore gloves while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Lowes, Ace Hardware, Menards, Home Depot, and Walmart.

32.    On October 21, 2016, Plaintiff Benedict was diagnosed with NHL in Youngstown, by Richard Pearlstein MD, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - St. Louis County - August 31, 2018 - 10:44 AM

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

33.     As a direct and proximate result of these injuries, Plaintiff Benedict has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Benedict has otherwise been damaged in a personal and pecuniary nature.

34.     During the entire time that Plaintiff Benedict was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Mazola Blackmon**

35.     Plaintiff Mazola Blackmon is a citizen of the State of Georgia and was born on June 24, 1950.  Plaintiff Blackmon resides in the City of East Point, County of Fulton.

36.     Plaintiff Blackmon was exposed to Roundup® in College Park, Georgia from 1975 through 1985 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through September, two times each week.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Home Depot.

37.     On November 3, 2016, Plaintiff Blackmon was diagnosed with NHL in Atlanta, Georgia at Kaiser Permanente, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

38.     As a direct and proximate result of these injuries, Plaintiff Blackmon has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Blackmon has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

39.     During the entire time that Plaintiff Blackmon was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

**Jo Ann Bono**

40.     Plaintiff Jo Ann Bono is a citizen of the State of Alabama and was born on June 19, 1953.  Plaintiff Bono resides in the City of Anniston, County of Calhoun.

41.     Plaintiff Bono was exposed to Roundup® in Anniston, Alabama from 1985 through 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through September, one to two times each month.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Walmart and Lowe's.

42.     Plaintiff Bono was further exposed to Roundup® in Anniston, Alabama from 1985 through 2000 while spraying Roundup® at her rental property.  Plaintiff sprayed Roundup® every year from April through September, two times each month.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Walmart and Lowes.

43.     Plaintiff Bono was further exposed to Roundup® in Anniston, Alabama from 1985 through 1989 while spraying Roundup® at her mother's property.  Plaintiff sprayed Roundup® every year from April through September, one to two times each month.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Walmart and Lowe's.

44.     On June 29, 2009, Plaintiff Bono was diagnosed with NHL in Birmingham, Alabama at St. Vincent's Health System, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

45.     As a direct and proximate result of these injuries, Plaintiff Bono has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Bono has otherwise been damaged in a personal and pecuniary nature.

46.     During the entire time that Plaintiff Bono was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### Joe L. Boswell

47.     Plaintiff Joe L. Boswell is a citizen of the State of Mississippi and was born on September 20, 1941.  Plaintiff Boswell resides in the City of Collinsville, County of Lauderdale.

48.     Plaintiff Boswell was exposed to Roundup® in Philadelphia, Mississippi from 1974 through 2012 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from May through October, once every three weeks.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Home Depot, Lowe's, Walmart, and a local farmer's co-op.

49.     Plaintiff Boswell was further exposed to Roundup® in Section, Alabama from 2008 through 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup®  every year from May through October, on a biweekly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Home Depot, Lowe's, Walmart, and local farmer's co-op.

50.     Plaintiff Boswell was further exposed to Roundup® in Scottsboro, Alabama from 2014 through 2015 while spraying Roundup® at his farm.  Plaintiff sprayed Roundup®  every year

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

from May through October, three to four times each week.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Home Depot, Lowe's, Walmart, and a local farmer's co-op.

51.    On June 14, 2017, Plaintiff Boswell was diagnosed with NHL in Scottsboro, Alabama at Open MRI of Scottsboro, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

52.    As a direct and proximate result of these injuries, Plaintiff Boswell has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Boswell has otherwise been damaged in a personal and pecuniary nature.

53.    During the entire time that Plaintiff Boswell was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Troy W. Boyde**

54.    Plaintiff Troy W. Boyde is a citizen of the State of Texas and was born on August 15, 1959.  Plaintiff Boyde resides in the City of Dallas, County of Dallas.

55.    Plaintiff Boyde was exposed to Roundup® in Dallas, Texas from 1975 through 1980 while spraying Roundup® occupationally.  Plaintiff sprayed Roundup® every year from April through September, on a monthly basis.  Plaintiff occasionally wore gloves, and a mask while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff was supplied Roundup® for use by his employer.

56.     On July 7, 2017, Plaintiff Boyde was diagnosed with NHL in Dallas, Texas at Methodist Dallas Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

57.     As a direct and proximate result of these injuries, Plaintiff Boyde has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Boyde has otherwise been damaged in a personal and pecuniary nature.

58.     During the entire time that Plaintiff Boyde was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Michael G. Bree**

59.     Plaintiff Michael G. Bree is a citizen of the State of Wyoming and was born on December 6, 1947.  Plaintiff Bree resides in the City of Cody, County of Park.

60.     Plaintiff Bree was exposed to Roundup® in Trenton, New Jersey from 1974 through 1979 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through September, two times each year.  Plaintiff wore gloves while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at local hardware stores.

61.     Plaintiff Bree was further exposed to Roundup® in West Burlington, Iowa from 1979 through 1980 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through September, one to two times each year.  Plaintiff wore gloves while spraying

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at local hardware stores.

62.    Plaintiff Bree was further exposed to Roundup® in Libby, Montana from 1980 through 1989 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through September, one to two times each year.  Plaintiff wore gloves while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at local hardware stores.

63.    Plaintiff Bree was further exposed to Roundup® in Cody, Wyoming from 1989 through 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through September, four to five times each year.  Plaintiff wore gloves while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at local farm supply stores.

64.    On October 23, 2007, Plaintiff Bree was diagnosed with NHL in Cody, Wyoming at West Park Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

65.    As a direct and proximate result of these injuries, Plaintiff Bree has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Bree has otherwise been damaged in a personal and pecuniary nature.

66.    During the entire time that Plaintiff Bree was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

**Ronnie Brown**

67.    Plaintiff Ronnie Brown is a citizen of the State of Alabama and was born on August 5, 1959.  Plaintiff Brown resides in the City of Birmingham, County of Jefferson.

68.    Plaintiff Brown was exposed to Roundup® in Birmingham, Alabama from 1995 through 2016 while spraying Roundup® occupationally as a landscaper. Plaintiff sprayed Roundup® each year from April through September, on a monthly basis.  Plaintiff occasionally wore a mask and gloves while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself. Plaintiff was supplied Roundup® for use by his employer.

69.    Plaintiff Brown was further exposed to Roundup® in Birmingham, Alabama from 1999 through 2016 while spraying Roundup® at his home. Plaintiff sprayed Roundup® each year from April through September, on a monthly basis.  Plaintiff occasionally wore a mask and gloves while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself. Plaintiff purchased Roundup® for use at Lowe's, Home Depot, and local hardware stores.

70.    On or about November 25, 2009, Plaintiff Brown was diagnosed with NHL in Birmingham, Alabama at Birmingham VA Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

71.    As a direct and proximate result of these injuries, Plaintiff Brown has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Brown has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

72.     During the entire time that Plaintiff Brown was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Terrance Burton

73.     Plaintiff Terrance Burton is a citizen of the State of Oklahoma and was born on June 29, 1967. Plaintiff Burton resides in the City of Shawnee, County of Pottawatomie.

74.     Plaintiff Burton was exposed to Roundup® in North Plainfield, New Jersey from 2002 through 2017 while spraying Roundup® residentially. Plaintiff sprayed Roundup® every year from October through July, on a weekly basis. Plaintiff wore no protective gear while spraying Roundup®. Plaintiff used both premixed and concentrated Roundup®, which he mixed himself. Plaintiff purchased Roundup® for use at Home Depot.

75.     On August 15, 2012, Plaintiff Burton was diagnosed with NHL in New Brunswick, New Jersey at Robert Wood Johnson University Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

76.     As a direct and proximate result of these injuries, Plaintiff Burton has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Burton has otherwise been damaged in a personal and pecuniary nature.

77.     During the entire time that Plaintiff Burton was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to her health or the health of others.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

**Douglas Caldwell**

78.    Plaintiff Douglas Caldwell is a citizen of the State of Idaho and was born on June 25, 1954.  Plaintiff Caldwell resides in the City of Coolin, County of Bonner.

79.    Plaintiff Caldwell was exposed to Roundup® in Coolin, Idaho from 2004 through 2007 while spraying Roundup® occupationally.  Plaintiff sprayed Roundup® every year from May through July, twice each year.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff was supplied Roundup® for use by his employer.

80.    Plaintiff Caldwell was further exposed to Roundup® in Coolin, Idaho from 2006 through 2010 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from May through July, twice each year.  Plaintiff occasionally wore protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at True Value Hardware.

81.    On March 17, 2008, Plaintiff Caldwell was diagnosed with NHL in Coeur D'Alene, Idaho at Kootenai Health, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

82.    As a direct and proximate result of these injuries, Plaintiff Caldwell has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Caldwell has otherwise been damaged in a personal and pecuniary nature.

83.    During the entire time that Plaintiff Caldwell was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

## Ronald Carnes

84.     Plaintiff Ronald Carnes is a citizen of the State of Illinois and was born on April 14, 1945.  Plaintiff Carnes resides in the City of Joliet, County of Will.

85.     Plaintiff Carnes was exposed to Roundup® in Joliet, Illinois from 1998 through 2016 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through September, on a weekly basis.  Plaintiff wore gloves while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Menards and Kmart.

86.     On March 21, 2017, Plaintiff Carnes was diagnosed with NHL in Hines, Illinois at Edward Hines, Jr. VA Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

87.     As a direct and proximate result of these injuries, Plaintiff Carnes has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Carnes has otherwise been damaged in a personal and pecuniary nature.

88.     During the entire time that Plaintiff Carnes was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

## Michael Chaiklin

89.     Plaintiff Michael Chaiklin is a citizen of the State of Connecticut and was born on April 8, 1940.  Plaintiff Chaiklin resides in the City of Bloomfield, County of Hartford.

90.     Plaintiff Chaiklin was exposed to Roundup® in Bloomfield, Connecticut from 1983 through 1995 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

May through September, two to three times each week.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Home Depot, Lowes and local hardware stores.

91.     Plaintiff Chaiklin was further exposed to Roundup® in Bloomfield, Connecticut from 1996 to 2006, and 2015 to 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from May through September, two to three times each week. Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Home Depot, Lowe's, and local hardware stores.

92.     Plaintiff Chaiklin was further exposed to Roundup® in Bloomfield, Connecticut from 1996 to 2006, and 2015 to 2017 while spraying Roundup® occupationally.  Plaintiff sprayed Roundup® every year from May through September, two to three times each week. Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Home Depot, Lowes and local hardware stores.

93.     On July 26, 2017, Plaintiff Chaiklin was diagnosed with NHL in Hartford, Connecticut at Hartford Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

94.     As a direct and proximate result of these injuries, Plaintiff Chaiklin has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

and loss of enjoyment of life, and Plaintiff Chaiklin has otherwise been damaged in a personal and pecuniary nature.

95.     During the entire time that Plaintiff Chaiklin was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Rodney Chambliss**

96.     Plaintiff Rodney Chambliss is a citizen of the State of Alabama and was born on March 6, 1952.  Plaintiff Chambliss resides in the City of Taylor, County of Houston.

97.     Plaintiff Chambliss was exposed to Roundup® in Greenwood, Florida from 1975 through 1995 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from March through November, on a biweekly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself. Plaintiff purchased Roundup® for use at various local hardware stores.

98.     Plaintiff Chambliss was further exposed to Roundup® in Dothan, Alabama from 2001 through 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from March through November, on a biweekly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at various local hardware stores, Lowe's, and Home Depot.

99.     On May 3, 2017, Plaintiff Chambliss was diagnosed with NHL in Dothan, Alabama at Southeast Alabama Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

100.    As a direct and proximate result of these injuries, Plaintiff Chambliss has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Chambliss has otherwise been damaged in a personal and pecuniary nature.

101.    During the entire time that Plaintiff Chambliss was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Louis J. Cognata**

102.    Plaintiff Louis J. Cognata is a citizen of the State of Texas and was born on May 14, 1950.  Plaintiff Cognata resides in the City of Beach City, County of Chambers.

103.    Plaintiff Cognata was exposed to Roundup® in Beach City, Texas from 1989 through 2010 while spraying Roundup® residentially and at his 132-acre ranch.  Plaintiff sprayed Roundup® year- round, on a monthly basis.  Plaintiff wore gloves while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Lowes, and Walmart.

104.    Plaintiff Cognata was further exposed to Roundup® in Levelland, Texas from 1980 through 1981 while spraying Roundup® residentially and at his ranch.  Plaintiff sprayed Roundup® year- round, on a monthly basis.  Plaintiff wore gloves while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at local hardware stores.

105.    On or about December 28, 2010, Plaintiff Cognata was diagnosed with NHL in Houston, Texas at Baylor Clinic, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

106.    As a direct and proximate result of these injuries, Plaintiff Cognata has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Cognata has otherwise been damaged in a personal and pecuniary nature.

107.    During the entire time that Plaintiff Cognata was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### James A. Cole

108.    Plaintiff James A. Cole is a citizen of the State of Indiana and was born on July 17, 1951.  Plaintiff Cole resides in the City of Greenwood, County of Johnson.

109.    Plaintiff Cole was exposed to Roundup® in Greenwood, Indiana from 1996 through 2015 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from May through September, on a monthly basis.  Plaintiff occasionally wore gloves while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Menards.

110.    On November 2, 2012, Plaintiff Cole was diagnosed with NHL in Indianapolis, Indiana by Mayer Mary Lou MD, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

111.    As a direct and proximate result of these injuries, Plaintiff Cole has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Cole has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

112.    During the entire time that Plaintiff Cole was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Daniel Cox

113.    Plaintiff Daniel Cox is a citizen of the State of Florida and was born on October 8, 1943.  Plaintiff Cox resides in the City of Spring Hill, County of Hernando.

114.    Plaintiff Cox was exposed to Roundup® in Madera, California from 1976 through 2000 while spraying Roundup® at his home.  Plaintiff sprayed every year from April through December, on a biweekly basis.  Each application would last approximately one hour.  Plaintiff wore gloves while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Sears and K-Mart.

115.    On or about February 28, 2007, Plaintiff Cox was diagnosed with CLL, a sub-type of NHL, in Tampa, FL at James A. Haley Veterans' Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

116.    As a direct and proximate result of these injuries, Plaintiff Cox has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Cox has otherwise been damaged in a personal and pecuniary nature.

117.    During the entire time that Plaintiff Cox was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**James E. Cross**

118.   Plaintiff James E. Cross is a citizen of the State of Georgia and was born on July 22, 1956.  Plaintiff Cross resides in the City of Cartersville, County of Bartow.

119.   Plaintiff Cross was exposed to Roundup® in Winter Haven, Florida from 1980 through 1984 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from February through November, on a weekly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Ace Hardware, Lowes, Walmart, and Home Depot.

120.   Plaintiff Cross was further exposed to Roundup® in Conyers, Georgia from 1984 through 1986 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through September, on a weekly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Ace Hardware, Lowes, Walmart, and Home Depot.

121.   Plaintiff Cross was further exposed to Roundup® in Greensboro, North Carolina from 1986 through 1987 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through September, on a weekly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Ace Hardware, Lowe's, Walmart, and Home Depot.

122.   Plaintiff Cross was further exposed to Roundup® in Winter Haven, Florida from 1988 through 2006 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from February through November, on a weekly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

himself.  Plaintiff purchased Roundup® for use at Ace Hardware, Lowes, Walmart, and Home Depot.

123.    Plaintiff Cross was further exposed to Roundup® in Winter Haven, Florida from 1988 through 2006 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from February through November, on a weekly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Ace Hardware, Lowe's, Walmart, and Home Depot.

124.    Plaintiff Cross was further exposed to Roundup® in Cleveland, Tennessee from 2006 through 2011 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through November, on a weekly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself. Plaintiff purchased Roundup® for use at Ace Hardware, Lowe's, Walmart, and Home Depot.

125.    Plaintiff Cross was further exposed to Roundup® in Carterville, Georgia from 2011 through 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through November, on a weekly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself. Plaintiff purchased Roundup® for use at Ace Hardware, Lowe's, Walmart, and Home Depot.

126.    On May 17, 2017, Plaintiff Cross was diagnosed with NHL in Cartersville, Georgia at Northwest Georgia Oncology Center Cartersville, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

127.    As a direct and proximate result of these injuries, Plaintiff Cross has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Cross has otherwise been damaged in a personal and pecuniary nature.

128.    During the entire time that Plaintiff Cross was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Charles Dinnis**

129.    Plaintiff Charles Dinnis is a citizen of the State of Pennsylvania and was born on February 3, 1958.  Plaintiff Dinnis resides in the City of Warrington, County of Bucks.

130.    Plaintiff Dinnis was exposed to Roundup® in Warrington, Pennsylvania from 1976 through 2001 while spraying Roundup®  residentially and occupationally.  Plaintiff sprayed Roundup® every year from April through October, on a monthly basis.  Plaintiff wore occasionally mask and gloves while spraying Roundup®.  Plaintiff used premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Home Depot, and Lowe's.

131.    On April 9, 2012, Plaintiff Dinnis was diagnosed with NHL in Doylestown, Pennsylvania at Doylestown Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

132.    As a direct and proximate result of these injuries, Plaintiff Dinnis has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Dinnis has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

133.    During the entire time that Plaintiff Dinnis was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Jeffrey Drach**

134.    Plaintiff Jeffrey Drach is a citizen of the State of Michigan and was born on November 27, 1956.  Plaintiff Drach resides in the City of Berrien Center, County of Berrien.

135.    Plaintiff Drach was exposed to Roundup® in Berrien Center from 1987 through 2017 while spraying Roundup® residentially.  Plaintiff sprayed every year from May through September, on a monthly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Lowes and Menards.

136.    On February 17, 2006, Plaintiff Drach was diagnosed with NHL in St. Joseph, Michigan at Lakeland Regional Health, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

137.    As a direct and proximate result of these injuries, Plaintiff Drach has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Drach has otherwise been damaged in a personal and pecuniary nature.

138.    During the entire time that Plaintiff Drach was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

**Rodney Dunham**

139.    Plaintiff Rodney Dunham is a citizen of the State of Michigan and was born on October 26, 1942.  Plaintiff Dunham resides in the City of Prescott, County of Ogemaw.

140.    Plaintiff Dunham was exposed to Roundup® in Bellville, Michigan from 1982 through 1987 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year in April, July, and September, on a bimonthly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Walmart, Kmart, Ace Hardware, and local hardware stores.

141.    Plaintiff Dunham was further exposed to Roundup® in Prescott, Michigan from 1987 through 2016 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from June through September, once every six weeks.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Walmart, Kmart, Ace Hardware, and local hardware stores.

142.    On August 18, 2006, Plaintiff Dunham was diagnosed with NHL in Ann Arbor, Michigan at The University of Michigan- University Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

143.    As a direct and proximate result of these injuries, Plaintiff Dunham has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Dunham has otherwise been damaged in a personal and pecuniary nature.

144.     During the entire time that Plaintiff Dunham was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Marco K. Fejes

145.     Plaintiff Marco K. Fejes is a citizen of the State of Florida and was born on September 17, 1959.  Plaintiff Fejes resides in the City of Cottondale, County of Jackson.

146.     Plaintiff Fejes was exposed to Roundup® in Graceville, Florida, Abbeville, Alabama, Union Springs, Alabama, De Funiak Springs, Florida, Perry, Florida, Crystal River, Florida, Brooksville, Florida, and Marianna, Florida from 1988 through 2010 while spraying Roundup® occupationally.   Plaintiff sprayed Roundup® year-round, three to four times each month.  Plaintiff wore a respirator and safety glasses while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself.   Plaintiff purchased Roundup® for use at Lowes, and HD Supply.

147.     Plaintiff Fejes was further exposed to Roundup® in Cottondale, Florida from 2004 through 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® year- round, one to two times each month.  Plaintiff wore a respiratory and safety glasses while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use Lowes.

148.     On July 17, 2017, Plaintiff Fejes was diagnosed with NHL in Dothan, Alabama at Dothan Hematology and Oncology, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

149.     As a direct and proximate result of these injuries, Plaintiff Fejes has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

loss of enjoyment of life, and Plaintiff Fejes has otherwise been damaged in a personal and pecuniary nature.

150.    During the entire time that Plaintiff Fejes was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**David Flynn**

151.    Plaintiff David Flynn is a citizen of the State of Michigan and was born on January 18, 1941.  Plaintiff Flynn resides in the Township of Independence, County of Oakland.

152.    Plaintiff Flynn was exposed to Roundup® in Clarkston, Michigan from 2000 through 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from May through October, on a weekly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at local hardware stores, Home Depot, Ace Hardware and Meijer.

153.    On June 13, 2012, Plaintiff Flynn was diagnosed with NHL in Sterling Heights, Michigan at The Cancer Leukemia Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

154.    As a direct and proximate result of these injuries, Plaintiff Flynn has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Flynn has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

155.    During the entire time that Plaintiff Flynn was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Julie Fowler**

156.    Plaintiff Julie Fowler is a citizen of the State of Kentucky and was born on July 20, 1958.  Plaintiff Fowler resides in the City of Goshen, County of Oldham.

157.    Plaintiff Fowler was exposed to Roundup® in Goshen, Kentucky from 2007 through 2015 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from May through September, two times each month.  Plaintiff wore gloves, long pants and a mask while spraying Roundup®.  Plaintiff used concentrated Roundup®, which she mixed herself.  Plaintiff purchased Roundup® for use at various local hardware stores, Home Depot, and Lowe's.

158.    On September 1, 2016, Plaintiff Fowler was diagnosed with NHL in Louisville, Kentucky at Baptist Health, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

159.    As a direct and proximate result of these injuries, Plaintiff Fowler has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Fowler has otherwise been damaged in a personal and pecuniary nature.

160.    During the entire time that Plaintiff Fowler was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

**Knolton Gant**

161.    Plaintiff Knolton Gant is a citizen of the State of Virginia and was born on September 3, 1943.  Plaintiff Gant resides in the City of Richmond, County of Henrico.

162.    Plaintiff Gant was exposed to Roundup® in Detroit, Michigan from 1995 through 2011 while spraying Roundup® at his home.  Plaintiff sprayed Roundup® each year from April through September, on a weekly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Lowe's and Home Depot.

163.    Plaintiff Gant was further exposed to Roundup® in Richmond, Virginia from 2011 through 2017 while spraying Roundup® at his home.  Plaintiff sprayed Roundup® each year from April through September, on a weekly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Lowe's and Home Depot.

164.    On or about May 5, 2010, Plaintiff Gant was diagnosed with NHL in Detroit, Michigan at Heidelberg Dermatology, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

165.    As a direct and proximate result of these injuries, Plaintiff Gant has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Gant has otherwise been damaged in a personal and pecuniary nature.

166.    During the entire time that Plaintiff Gant was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**John Goraczkowski**

167.    Plaintiff John Goraczkowski is a citizen of the State of Minnesota and was born on January 31, 1957.  Plaintiff Goraczkowski resides in the City of Orr, County of Saint Louis.

168.    Plaintiff Goraczkowski was exposed to Roundup® in Swea City, Iowa from 1986 through 1992 while spraying Roundup® occupationally.  Plaintiff sprayed Roundup® between 14 and 21 days during the month of July each year.  Each daily application would last approximately 12 hours.  Plaintiff wore gloves while mixing Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at various local feed supply stores.

169.    Plaintiff Goraczkowski was further exposed to Roundup® in Albia, IA from 1992 through 2007 while spraying Roundup® occupationally.  Plaintiff sprayed Roundup® between 14 and 21 days during the month of July each year.  Each daily application would last approximately 12 hours.  Plaintiff wore gloves while mixing Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at various local feed supply stores.

170.    On or about July 10, 2017, Plaintiff Goraczkowski was diagnosed with NHL in International Falls, Minnesota at Essential Health – International Falls Clinic, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

171.    As a direct and proximate result of these injuries, Plaintiff Goraczkowski has incurred and will incur medical expenses in the future and has endured and will endure pain and

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

suffering and loss of enjoyment of life, and Plaintiff Goraczkowski has otherwise been damaged in a personal and pecuniary nature.

172.    During the entire time that Plaintiff Goraczkowski was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Jon Grady

173.    Plaintiff Jon Grady is a citizen of the State of New Jersey and was born on March 5, 1981.  Plaintiff Grady resides in the City of Deptford, County of Gloucester.

174.    Plaintiff Grady was exposed to Roundup® in Runnemede, New Jersey from 2002 through 2005 while spraying Roundup® occupationally.  Plaintiff sprayed Roundup® every year from March through October, five days each week.  Plaintiff wore gloves while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff was supplied Roundup® for use by his employer.

175.    Plaintiff Grady was further exposed to Roundup® in Deptford, New Jersey from 2005 through 2007 while spraying Roundup® occupationally.  Plaintiff sprayed Roundup® every year from March through November, five days each week.  Plaintiff wore gloves while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff was supplied Roundup® for use by his employer.

176.    Plaintiff Grady was further exposed to Roundup® in Blackwood, New Jersey in 2007 while spraying Roundup® occupationally.  Plaintiff sprayed Roundup® every year from March through October, five days each week.  Plaintiff wore gloves while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff was supplied Roundup® for use by his employer.

177.    Plaintiff Grady was further exposed to Roundup® in Stratford, New Jersey in 2008 while spraying Roundup® occupationally.  Plaintiff sprayed Roundup® every year from March through November, five days each week.  Plaintiff wore gloves while spraying Roundup®. Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff was supplied Roundup® for use by his employer.

178.    On January 7, 2016, Plaintiff Grady was diagnosed with NHL in Newark, New Jersey at University Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

179.    As a direct and proximate result of these injuries, Plaintiff Grady has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Grady has otherwise been damaged in a personal and pecuniary nature.

180.    During the entire time that Plaintiff Grady was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Dana S. Gross**

181.    Plaintiff Dana S. Gross is a citizen of the State of Georgia and was born on January 8, 1967.  Plaintiff Gross resides in the City of Meansville, County of Pike.

182.    Plaintiff Gross was exposed to Roundup® in Thomaston, Georgia from 1985 through 2000 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through October, two times each month.  Plaintiff wore no protective gear while spraying

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which she mixed herself. Plaintiff purchased Roundup® for use at Home Depot, and Walmart.

183.    Plaintiff Gross was further exposed to Roundup® in Molena, Georgia from 2000 through 2014 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through October, two times each month.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used both premixed and concentrated Roundup®, which she mixed herself. Plaintiff purchased Roundup® for use at Home Depot and Walmart.

184.    Plaintiff Gross was further exposed to Roundup® in Griffin, Georgia from 2004 through 2008 while spraying Roundup® occupationally.  Plaintiff sprayed Roundup® every year from April through October, on a monthly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff was supplied Roundup® for use by her employer.

185.    On or about April 2015, Plaintiff Gross was diagnosed with NHL in Griffin, Georgia at Northside Hospital-Atlanta, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

186.    As a direct and proximate result of these injuries, Plaintiff Gross has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Gross has otherwise been damaged in a personal and pecuniary nature.

187.    During the entire time that Plaintiff Gross was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

### Thomas G. Hendrix

188.    Plaintiff Thomas G. Hendrix is a citizen of the State of Georgia and was born on July 5, 1949.  Plaintiff Hendrix resides in the City of Statesboro, County of Bulloch.

189.    Plaintiff Hendrix was exposed to Roundup® in Bulloch County, Wayne County, Bulloch County, Candler County, Tattnall County, Burke County, Screven County, Evans County, Toombs County in the state of Georgia from 1974 through 2015 while spraying Roundup® occupationally.  Plaintiff sprayed Roundup® every year in February through June, on a weekly basis.  Plaintiff wore gloves, and a Tyvek Suit while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at various local farm and chemical suppliers.

190.    On March 6, 2015, Plaintiff Hendrix was diagnosed with NHL in Savannah, Georgia at Summit Cancer Care, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

191.    As a direct and proximate result of these injuries, Plaintiff Hendrix has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Hendrix has otherwise been damaged in a personal and pecuniary nature.

192.    During the entire time that Plaintiff Hendrix was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

**James Hinson, individually and on the behalf of, Mary Hinson**

193.    Plaintiff Hinson is an adult whose principal place of residence is the City of Hillister, County of Tyler, State of Texas, who brings this action in his capacity as the surviving heir of Mary Hinson.  Mary Hinson died on July 17, 2017, in State of Texas, County of Tyler. Plaintiff is pursuing this action due to the personal injury suffered by Mary Hinson in his representative capacity as surviving heir. Mary Hinson's injury was the direct and proximate result of her exposure to Roundup® and subsequent NHL lymphoma diagnosis.

194.    Mary Hinson was exposed to Roundup® in Brookeland, Texas from 1998 through 2002 while spraying Roundup® at her property.  Mary Hinson sprayed Roundup® each year from May through August, on a monthly basis.  Mary Hinson wore no protective gear while spraying Roundup®.  Mary Hinson used both premixed and concentrated Roundup®, which she mixed herself.  Mary Hinson purchased Roundup® for use at various local hardware stores.

195.    Mary Hinson was further exposed to Roundup® in Nederland, Texas from 1974 through 2002 while spraying Roundup® at her property.  Mary Hinson sprayed Roundup® each year from May through August, on a monthly basis.  Mary Hinson wore no protective gear while spraying Roundup®.  Mary Hinson used both premixed and concentrated Roundup®, which she mixed herself.  Mary Hinson purchased Roundup® for use at various local hardware stores.

196.    On or about August 7, 2012, Mary Hinson was diagnosed with NHL in Beaumont, Texas at Texas Oncology-Beaumont Mamie McFaddin Ward Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

197.    As a direct and proximate result of these injuries, Plaintiff James Hinson as survivor on the behalf of Mary Hinson incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and James Hinson on the behalf of Mary Hinson has otherwise been damaged in a personal and pecuniary nature.

198.    During the entire time that Mary Hinson was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

**Patricia Hoffman, individually and on the behalf of, Bernard Hoffman**

199.    Plaintiff Patricia Hoffman is an adult whose principal place of residence is the City of Pennington, County of Mercer, State of New Jersey, who brings this action in her capacity as the surviving heir of Bernard Hoffman. Bernard Hoffman died on September 16, 2010, in Princeton Borough, New Jersey, County of Mercer.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Bernard Hoffman in her representative capacity as surviving heir.  Bernard Hoffman's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

200.    Bernard Hoffman was exposed to Roundup® in Pennington, New Jersey from 1985 through 2008 while spraying Roundup® at his residence and on his farm. Bernard Hoffman sprayed Roundup® each year from May through September, four times annually.  Bernard Hoffman wore a mask and gloves while spraying Roundup®.  Bernard Hoffman used concentrated Roundup®, which he mixed himself.  Bernard Hoffman purchased Roundup® for use at a local farm supplier.

201.    On or about August 1, 2008, Bernard Hoffman was diagnosed with NHL in Princeton, New Jersey at Princeton Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

202.    As a direct and proximate result of these injuries, Plaintiff Patricia Hoffman as survivor on the behalf of Bernard Hoffman incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Patricia Hoffman as representative of Bernard Hoffman has otherwise been damaged in a personal and pecuniary nature.

203.    During the entire time that Bernard Hoffman was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**George Horstmann**

204.    Plaintiff George Horstmann is a citizen of the State of Louisiana and was born on October 21, 1942.  Plaintiff Horstmann resides in the City of Folsom, County of St. Tammany.

205.    Plaintiff Horstmann was exposed to Roundup® in Folsom, Louisiana from 1980 through 2005 while spraying Roundup® occupationally.  Plaintiff sprayed Roundup® every year from April through September, once each week.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself.  Plaintiff purchased Roundup® for use at Home Depot, Lowes, Ace Hardware, and local feed and seed supply stores.

206.    Plaintiff Horstmann was further exposed to Roundup® in Folsom, Louisiana from 1990 through 2006 while spraying Roundup® at his horse farm.  Plaintiff sprayed Roundup® every year from April through October, two times each week.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself. Plaintiff purchased Roundup® for use at Home Depot, Lowe's, Ace Hardware, and local feed and seed supply stores.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

207.    Plaintiff Horstmann was further exposed to Roundup® in Folsom, Louisiana from 1982 through 2018 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through October, on a weekly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself. Plaintiff purchased Roundup® for use at Home Depot, Lowe's, Ace Hardware, and local feed and seed supply stores.

208.    Plaintiff Horstmann was further exposed to Roundup® in Folsom, Louisiana from 1980 through 1982 while spraying Roundup® at his father's farm.  Plaintiff sprayed Roundup® every year from April through September, once each week.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself. Plaintiff purchased Roundup® for use at Home Depot, Lowe's, Ace Hardware, and local feed and seed supply stores.

209.    On February 10, 2014, Plaintiff Horstmann was diagnosed with NHL in Covington, Louisiana at St. Tammany Parish Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

210.    As a direct and proximate result of these injuries, Plaintiff Horstmann has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Horstmann has otherwise been damaged in a personal and pecuniary nature.

211.    During the entire time that Plaintiff Horstmann was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

## Donnie B. Humphrey

212.    Plaintiff Donnie B. Humphrey is a citizen of the State of Tennessee and was born on October 2, 1953.  Plaintiff Humphrey resides in the City of Louisville, County of Blount.

213.    Plaintiff Humphrey was exposed to Roundup® in Louisville, Tennessee from 1985 through 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from June through August, on a monthly basis.  Plaintiff occasionally wore safety glasses while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself. Plaintiff purchased Roundup® for use at local farmer co-ops and Walmart.

214.    On July 28, 2011, Plaintiff Humphrey was diagnosed with NHL in Maryville, Tennessee at Blount Memorial Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

215.    As a direct and proximate result of these injuries, Plaintiff Humphrey has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Humphrey has otherwise been damaged in a personal and pecuniary nature.

216.    During the entire time that Plaintiff Humphrey was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

## Robert Johnson Jr.

217.    Plaintiff Robert Johnson Jr. is a citizen of the State of Alabama and was born on October 8, 1961.  Plaintiff Johnson resides in the City of Demopolis, County of Marengo.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

218.    Plaintiff Johnson was exposed to Roundup® in Demopolis, Alabama from 1990 through 2016 while spraying Roundup® at his multiple properties.  Plaintiff sprayed Roundup® every year from March through October, on a biweekly basis.  Plaintiff wore gloves and safety glasses while spraying Roundup®.  Plaintiff used concentrated Roundup®, which he mixed himself. Plaintiff purchased Roundup® for use at local farmer co-ops.

219.    On February 28, 1997, Plaintiff Johnson was diagnosed with NHL in Demopolis, Alabama at Bryan W. Whitfield Memorial Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

220.    As a direct and proximate result of these injuries, Plaintiff Johnson has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Johnson has otherwise been damaged in a personal and pecuniary nature.

221.    During the entire time that Plaintiff Johnson was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Johnny Jordan**

222.    Plaintiff Johnny Jordan is a citizen of the State of Alabama and was born on June 19, 1956.  Plaintiff Jordan resides in the City of Millport, County of Lamar.

223.    Plaintiff Jordan was exposed to Roundup® in Millport, Alabama from 1986 through 2007 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through October, on a biweekly basis.  Plaintiff wore no protective gear while spraying Roundup®.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

Plaintiff used concentrated Roundup®, which he mixed himself. Plaintiff purchased Roundup® for use at local hardware stores.

224.    On or about February 2012, Plaintiff Jordan was diagnosed with NHL in Columbus, Mississippi at Baptist Cancer center- Golden Triangle, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

225.    As a direct and proximate result of these injuries, Plaintiff Jordan has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Jordan has otherwise been damaged in a personal and pecuniary nature.

226.    During the entire time that Plaintiff Jordan was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Richard W. King

227.    Plaintiff Richard W. King is a citizen of the State of Ohio and was born on June 10, 1942. Plaintiff King resides in Sugarcreek Township, County of Greene.

228.    Plaintiff King was exposed to Roundup® in Sugarcreek Township, Beavercreek and Fairborn, Ohio from 1974 through 2017 while spraying Roundup® at his home. Plaintiff sprayed Roundup® every year from April through September, three to four times each year. Plaintiff wore no protective gear while spraying Roundup®. Plaintiff used both premixed and concentrated Roundup®, which he mixed himself. Plaintiff purchased Roundup® for use at various local hardware stores.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

229.    In or around June 1, 2010, Plaintiff King was diagnosed with NHL in Kettering, Ohio at Kettering Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

230.    As a direct and proximate result of these injuries, Plaintiff King has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff King has otherwise been damaged in a personal and pecuniary nature.

231.    During the entire time that Plaintiff King was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Deborah S. Kocka**

232.    Plaintiff Deborah S. Kocka is a citizen of the State of Ohio and was born on November 15, 1970.  Plaintiff Kocka resides in the City of Medina, County of Medina.

233.    Plaintiff Kocka was exposed to Roundup® in Medina, Ohio from 2002 through 2017 while spraying Roundup® residentially.  Plaintiff sprayed every year from April through October, on a biweekly basis.  Plaintiff wore no protective gear while spraying Roundup®. Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Home Depot.

234.    On March 13, 2012, Plaintiff Kocka was diagnosed with NHL in Medina, Ohio at Cleveland Clinic- Medina Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

45

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

235.    As a direct and proximate result of these injuries, Plaintiff Kocka has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Kocka has otherwise been damaged in a personal and pecuniary nature.

236.    During the entire time that Plaintiff Kocka was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

**Grace Lauger**

237.    Plaintiff Grace Lauger is a citizen of the State of Texas and was born on December 12, 1944. Plaintiff Lauger resides in the City of Victoria, County of Victoria.

238.    Plaintiff Lauger was exposed to Roundup® in Dayton, Texas from 1975 through 1982 while spraying Roundup® residentially. Plaintiff sprayed Roundup® year-round, on a monthly basis. Plaintiff wore no protective gear while spraying Roundup®. Plaintiff used premixed Roundup®. Plaintiff purchased Roundup® for use at local hardware stores.

239.    On May 7, 2013, Plaintiff Lauger was diagnosed with NHL in Houston, Texas at University of Texas MD Anderson Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

240.    As a direct and proximate result of these injuries, Plaintiff Lauger has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Lauger has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

241.   During the entire time that Plaintiff Lauger was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### Marcia Lehmann

242.   Plaintiff Marcia Lehmann is a citizen of the State of Michigan and was born on September 22, 1956.  Plaintiff Lehmann resides in the City of Fountain, County of Mason.

243.   Plaintiff Lehmann was exposed to Roundup® in Chicago, Illinois from 1984 through 2002 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through August, on a monthly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Ace Hardware, Home Depot, and Hand Andy.

244.   Plaintiff Lehmann was further exposed to Roundup® in Fountain, Michigan from 2002 through 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from May through September, on a monthly basis.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Lowes and Home Depot.

245.   On or about April 2012, Plaintiff Lehmann was diagnosed with NHL in Maywood, Illinois at Loyola University Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

246.   As a direct and proximate result of these injuries, Plaintiff Lehmann has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

and loss of enjoyment of life, and Plaintiff Lehmann has otherwise been damaged in a personal and pecuniary nature.

247.    During the entire time that Plaintiff Lehmann was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### Joanne Leifheit

248.    Plaintiff Joanne Leifheit is a citizen of the State of Alaska and was born on December 7, 1955.  Plaintiff Leifheit resides in the City of Wasilla, County of Matanuska Susitna.

249.    Plaintiff Leifheit was exposed to Roundup® in Ashton, Illinois from 1994 through 2000 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through August, on a monthly basis.  Plaintiff wore gloves while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Lowes, Menards, and local farm supply stores.

250.    Plaintiff Leifheit was further exposed to Roundup® in Sycamore, Illinois from 2000 through 2013 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through August, on a monthly basis.  Plaintiff wore gloves while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Lowe's, Menards, and local farm supply stores.

251.    On February 4, 2014, Plaintiff Leifheit was diagnosed with NHL in DeKalb, Illinois at Northwestern Medicine Kishwaukee Hospital Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

252.    As a direct and proximate result of these injuries, Plaintiff Leifheit has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Leifheit has otherwise been damaged in a personal and pecuniary nature.

253.    During the entire time that Plaintiff Leifheit was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

**Jane Woody**

254.    Plaintiff Jane Woody is a citizen of the State of Florida and was born on December 27, 1943.  Plaintiff Woody resides in the City of Pensacola, County of Escambia.

255.    Plaintiff Woody was exposed to Roundup® in Pensacola, Florida from 2003 through 2016 while spraying Roundup® at her home.  Plaintiff sprayed every year from May through August, on a bimonthly basis.  Each application would last approximately one hour. Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used concentrated Roundup®, which she would often mix herself.  Plaintiff purchased Roundup® for use at various local hardware stores.

256.    On or about June 20, 2016, Plaintiff Woody was diagnosed with NHL in Pensacola, FL at Woodlands Medical Specialists, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

257.    As a direct and proximate result of these injuries, Plaintiff Woody has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

loss of enjoyment of life, and Plaintiff Woody has otherwise been damaged in a personal and pecuniary nature.

258.    During the entire time that Plaintiff Woody was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

**Joan Yanni**

259.    Plaintiff Joan Yanni is a citizen of the State of New York and was born on December 26, 1942.  Plaintiff Yanni resides in the City of Acra, County of Greene.

260.    Plaintiff Yanni was exposed to Roundup® in Yonkers, New York from 1997 through 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through September, once every three to four weeks.  Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at Lowes and Home Depot.

261.    Plaintiff Yanni was further exposed to Roundup® in Acra, New York from 1983 through 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every year from April through September, on a monthly basis for two consecutive days.   Plaintiff wore no protective gear while spraying Roundup®.  Plaintiff used premixed Roundup®.  Plaintiff purchased Roundup® for use at local farm supply stores, Home Depot, and Lowes.

262.    On July 22, 2016, Plaintiff Yanni was diagnosed with NHL in New York City, New York at Memorial Sloan Kettering Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

263.    As a direct and proximate result of these injuries, Plaintiff Yanni has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Yanni has otherwise been damaged in a personal and pecuniary nature.

264.    During the entire time that Plaintiff Yanni was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### DEFENDANT MONSANTO

265.    Defendant Monsanto is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.  At all relevant times, Monsanto also regularly conducted, transacted, and solicited business in St. Louis, Missouri, as well as in all States of the United States. Monsanto's world headquarters are located at 800 Lindbergh Boulevard in St. Louis County, Missouri.

266.    At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients. On information and belief, important scientific, manufacturing, marketing, sales, and other business decisions regarding Roundup® were made from and in the State of Missouri.

267.    At all times relevant to this complaint, Monsanto was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing Roundup® in the State of Missouri.

268.    At all relevant times, Monsanto had, and continues to have, regular and systematic contact with and conducts business in and from the State of Missouri, such that it has purposefully availed itself of the laws of the State and expects to both sue and be sued in Missouri.  In the

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

alternative, Monsanto's presence in the State of Missouri satisfies the due process requirements for Missouri courts to exercise jurisdiction over it.  In the alternative, Monsanto's domicile in the State of Missouri satisfies the due process requirements for Missouri courts to exercise jurisdiction over it.  In the alternative, Monsanto has consented to the exercise of jurisdiction over it by Missouri courts by registering to and conducting business from the State of Missouri.

## JOINDER AND VENUE

269.    At all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling, and packaging and Monsanto was in the business of marketing, promoting, and/or advertising Roundup® products in the State of Missouri and the County of St. Louis.

270.    At all times relevant hereto, Monsanto was a Delaware corporation with its headquarters and principal place of business in St. Louis County, Missouri, and therefore is a local defendant for purposes of removal.

271.    Venue is proper in St. Louis County under Mo. Rev. Stat. §508.010(5)(1) because this is a tort case in which Plaintiffs were first injured outside of Missouri, and the registered agent for Defendant, Monsanto is located in St. Louis County.

272.    All Plaintiffs herein are properly joined pursuant to Rule 52.05(a) of the Missouri rules of Civil Procedure as their claims all arise out of the same series of transactions or occurrences.  All claims in this action are a direct and proximate result of Defendants' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of the products as Roundup®, which was conducted without regard to individual Plaintiff differences.  All Plaintiffs in this action seek

recovery for damages as a result of developing NHL, which was directly and proximately caused by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and the attendant effects of developing NHL. All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' exposures to Roundup®.

## ALLEGATIONS COMMON TO ALL COUNTS

273.    In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.  Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.  In addition to the active ingredient glyphosate, Roundup® contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients.  In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually.  That number grew to 185 million pounds in 2007.[1]  As of 2013, glyphosate was the world's most widely used herbicide.

274.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware.  It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2]  The majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

crops.  In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.[3]

275.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4]  They are ubiquitous in the environment.  Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.[5]  It has been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

276.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

---

[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[5] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

277.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate.  In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

278.    The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*.  The IARC Working Group concluded that the cancers most associated with glyphosate exposure are NHL and other haematopoietic cancers, including lymphocytic lymphoma / chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

279.    The IARC evaluation is significant.  It confirms what has been believed for years: that glyphosate is toxic to humans.

280.    Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## FACTS

281.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

282.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because

---

[9] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra.*

plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

283.    For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer.  Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as garden center workers, nursery workers, and landscapers. Agricultural workers are, once again, victims of corporate greed.  Monsanto assured the public that Roundup® was harmless.  In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed Roundup®'s dangers.  Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

### The Discovery of Glyphosate and Development of Roundup®

284.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[10]  From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use.  It still markets Roundup® as safe today.[11]

---

[10] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[11] Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

285.    In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing.  Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

### *Registration of Herbicides under Federal Law*

286.    The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act.  7 U.S.C. § 136a(a).

287.    Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136a(c)(5)(D).

288.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide."  7 U.S.C. § 136(bb).  FIFRA thus

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

289.    The EPA and the State of California registered Roundup® for distribution, sale, and manufacture in the United States and the State of California.

290.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products.  The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation.  The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

291.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration."  7 U.S.C. § 136a-1.  In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

292.    In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

293.    Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C)

Electronically Filed - St. Louis County - August 31, 2018 - 10:44 AM

in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer:  "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

294.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

295.    In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[13]  IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

296.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.  The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[14]  An EPA reviewer

---

[12] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

[13] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

[14] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&To

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

297.     Three top executives of IBT were convicted of fraud in 1983.

298.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®.  In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

299.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

300.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

---

cEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[15] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

[16] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, *supra.*

301.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996.  Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop.  This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds.  It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

302.    Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product.  In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[17] Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertises the safety of Roundup®*

303.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

---

[17] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. Times, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

a) "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ..."

b) "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c) "Roundup biodegrades into naturally occurring elements."

d) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[18]

304.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

---

[18] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

\*        \*        \*

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

\*        \*        \*

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

\*        \*        \*

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

\*        \*        \*

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

\*        \*        \*

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

305.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

306.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®.  The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[19]

---

[19] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

*Classifications and Assessments of Glyphosate*

307.     The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

308.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[20]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

309.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

310.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological

---

[20] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

311. In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

312. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

313. The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

314. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

315.    Exposure pathways are identified as air (especially during spraying), water, and food.  Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

316.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

317.    The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

318.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

319.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma.   A second study reported a positive trend for hemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

320.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.  Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

321.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

322.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[21]   Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

323.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

324.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate.  This technical fact sheet predates IARC's March 20, 2015 evaluation.  The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

---

[21] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra* at 77.

[22] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49–54 (2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[23]

325.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[24]

### The Toxicity of Other Ingredients in Roundup®

326.    In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone.  Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

327.    In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup®

---

[23] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *supra*.

[24] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

[25] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

328.    A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.  The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell."  Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

329.    In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone.  The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[28]

---

[26] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

[27] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

[28] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

330.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.  The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food.  The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone.  The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide.  The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[29]

331.    The results of these studies were at all times available to Defendant.

332.    Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup® does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup®, the very product that caused Plaintiffs' NHL.[30]  Indeed, she further admitted that in the 35 years that Monsanto has marketed Roundup® to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup® product merely because EPA did not require that such a study be performed for registration of glyphosate.[31]

---

[29] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.

[30] *See* Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.

[31] *See id*.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

333.    Defendant thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

334.    Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

### The EPA's Review of Glyphosate

335.    In April 2016, personnel within the EPA's Office of Pesticides Program (OPP) leaked and posted on the internet a draft report on glyphosate carcinogenicity, entitled Cancer Assessment Review Committee (CARC) report, dated October 2015.  The EPA removed the documents by May 2, 2016, within days of initially posting it online.  An EPA spokesperson subsequently issued a statement on the agency's glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's docket. These documents have now been taken down because our assessment is not final. EPA has not completed our cancer review. We will look at the work of other governments as well as work by HHS's Agricultural Health Study as we move to make a decision on glyphosate. Our assessment will be peer reviewed and completed by end of 2016.[32]

336.    On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans' at doses relevant to human health risk assessment."[33]  There are no

---

[32] Carey Gillam, *What Is Going On With Glyphosate? EPA's Odd Handling of Controversial Chemical*, Huffington Post, May 2, 2016, *available at* http://www.huffingtonpost.com/carey-gillam/what-is-going-on-with-gly_b_9825326.html; *see also* P.J. Huffstutter, *EPA takes offline report that says glyphosate not likely carcinogenic*, Reuters, May 2, 2016, available at http://www.reuters.com/article/us-usa-glyphosate-epa-idUSKCN0XU01K.

[33] See EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016), *available at* https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf.

authors listed on this issue paper, which reiterates and adopts the conclusions of the October 2015 leaked assessment.   The issue paper is based upon a review of industry-sponsored articles and studies.   The OPP acknowledged that it rejected all studies that considered Roundup®—the formulated product—instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."[34]

337.    Thus, the OPP notes dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[35]

338.    From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate.  Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product.  In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel (SAP) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[36]

339.    The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

---

[34] *Id.*

[35] *Id.*

[36] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, available at, https://www.epa.gov/sites/production/files/2016-11/documents/glyphosate_sap_charge_questions_-final.pdf.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

340.    On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between **glyphosate** exposure and NHL.[37]

### *Monsanto's Industry Ties*

341.    Recently unsealed documents in the federal Roundup® MDL litigation reveal the extent to which Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup® from scrutiny and review.

342.    Internal Monsanto documents, including email communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf.  These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

343.    To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the EPA's review of glyphosate.  In one April 27, 2015 email, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything that would help them defend the situation?"  His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."[38]

---

[37] FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's Evaluation of the Carcinogenic Potential of Glyphosate, *available at* https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf.

[38] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. D, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-4.

344.    The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 email. Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi . . . . I am the chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June."[39]  Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier—in April 2015.

345.    Mr. Rowland also intervened to halt another agency's review of glyphosate.  When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public health agency of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Monsanto stop the ATSDR's investigation.  In the same April 28, 2015, email discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR.[40]  Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal."[41]  Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to

---

[39] *Id.*

[40] See id.

[41] Id.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA."[42]  The ATSDR never published its toxicological profile of glyphosate.

346.    Further, the released documents reveal Monsanto's confidence that its allies within the EPA would continue to support glyphosate.  In an internal memo on glyphosate, Monsanto executives wrote: "We know, *but cannot say*, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months."[43]  Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observed for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."[44]

### Recent Worldwide Bans on Roundup®/Glyphosate

347.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known.   The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which will take effect by the end of 2015.  In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons.  In garden centers, Roundup® is promoted as harmless, but unsuspecting

---

[42] *Id.*

[43] See Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. E, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-5 (emphasis original).

[44] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. G, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-7.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

customers have no idea what the risks of this product are.  Especially children are sensitive to toxic substances and should therefore not be exposed to it."[45]

348.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[46]

349.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[47]

350.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®.  The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[48]

351.    The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[49]

---

[45] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[46] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado nacional*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[47] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen"*, NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

[48] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May, 11 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

[49] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

352.    The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[50]

### EFSA Report on Glyphosate

353.    On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate.[51]  The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

354.    BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups.  As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

355.    Based on a review of the RAR, which included data from industry-submitted unpublished studies, EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC)

---

[50] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

[51] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *available at* http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

No 1272/2008."[52]  EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

356.    In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals.[53] Although IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[54]  IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioural practices."[55]  EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[56]

357.    EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities*

---

[52] *Id.*

[53] EFSA Fact Sheet: Glyphosate, EFSA http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112 en.pdf.

[54] *Id.*

[55] *Id.*

[56] *Id.*

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

*while they re-assess uses of glyphosate-based formulations in their own territories*.[57]

358.     Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg bw per day.[58]

### Leading Scientists Dispute EFSA's Conclusion

359.     On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[59]   The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[60]

360.     Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

361.     In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed

---

[57] *Id.*

[58] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *supra.*

[59] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), http://www.zeit.de/wissen/umwelt/2015-11/glyphosat-offener-brief.pdf; http://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate-weedkiller.

[60] *Id.*

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.[61]

362.    With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "*limited evidence* of carcinogenicity" for NHL, but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity.  IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established.  However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*." [62]

363.    Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis.  Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines.  For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range

---

[61] *Id.*

[62] *Id.*

80

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[63]

364.    The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[64]

---

[63] *Id.*

[64] *Id.*

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

365.    On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[65]

### Statement of Concern Regarding Glyphosate-Based Herbicides

366.    On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[66]    The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[67]    The researchers drew seven factual conclusions about GBHs:

1.    GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2.    Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3.    The half-life of glyphosate in water and soil is longer than previously recognized;

4.    Glyphosate and its metabolites are widely present in the global soybean supply;

5.    Human exposures to GBHs are rising;

6.    Glyphosate is now authoritatively classified as a probable human carcinogen; and

---

[65] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Mar. 3, 2016, *available at* http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

[66] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

[67] *Id.*

7. Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[68]

367. The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[69]

368. The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[70]

369. Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone

---

[68] *Id.*

[69] *Id.*

[70] *Id.*

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[71]

370. The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[72]

371. The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[73]

372. The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years)

---

[71] *Id.*

[72] *Id.*

[73] *Id.*

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[74]

373.    Despite these stated concerns, Monsanto, to date, has failed to test its formulated Roundup® products.

### European Union Vote on Glyphosate Renewal

374.    The license for glyphosate in the European Union (EU) was set to expire on June 30, 2016.

375.    Without an extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[75]

376.    In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

377.    On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency (ECHA) to rule on the safety of the chemical, which was expected by the end of 2017.[76]

---

[74] *Id.*

[75] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis European, *Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, *available at* http://www.reuters.com/article/us-health-eu-glyphosate-idUSKCN0ZE25B.

[76] Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, *available at* https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup-weedkiller-escapes-immediate-ban

378.    On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine (POEA) from all glyphosate-based herbicides, including Roundup®.[77]

379.    In March 2017, ECHA's Committee for Risk Assessment (RAC) concluded that the available scientific evidence did not meet the criteria to classify glyphosate as a carcinogen.[78]

380.    With the glyphosate license set to again expire on December 15, 2017, and after months of indecision among EU member states, on November 27, 2017, the EU voted to extend the glyphosate license for five more years.[79] Of the 28 EU members, 18 countries voted in favor of a European Commission proposal to extend the glyphosate license, 9 countries voted against, and 1 country abstained.[80]

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Discovery Rule Tolling*

381.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

382.    Plaintiffs have suffered an illness that has a latency period and does not arise until years after exposure. Plaintiffs had no way of knowing about the risks of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until they were made aware that their NHL could be caused by their use of and/or exposure to Roundup®. Consequently, the discovery

---

[77] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/?nl_ref=16562829

[78] https://echa.europa.eu/-/glyphosate-not-classified-as-a-carcinogen-by-echa.

[79] *See* Philip Blenkinsop, *Germany swings EU vote in favor of weed-killer glyphosate*, Reuters, Nov. 27, 2017, https://www.reuters.com/article/us-eu-health-glyphosate/germany-swings-eu-vote-in-favor-of-weed-killer-glyphosate-idUSKBN1DR1SG

[80] *See id.*

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

rule applies to these cases, and the statute of limitations has been tolled until the day that Plaintiffs knew or had reason to know that their NHL was linked to their use of and/or exposure to Roundup®.

383.    Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

384.    Plaintiffs did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause their NHL.

385.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

### *Fraudulent Concealment*

386.    Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and conduct, as alleged above.  Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiffs the true risks associated with use of or exposure to Roundup®.

387.    Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and conduct, as alleged above.  Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiffs the true risks associated with use of or exposure to Roundup®.

388.    As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence, that Plaintiffs had been exposed to

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

389.    Defendant is estopped from relying on any statute of limitations because of its concealment of the truth regarding the safety of Roundup®.  Defendant was under a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which it continues to have exclusive control.  Defendant knew that this information was not available to Plaintiffs, their medical providers and/or their health facilities, yet it failed to disclose the information to the public.

390.    Defendant had the ability to and did spend enormous amounts of money in furtherance of its purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks.  Plaintiffs and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendant's representations.

### *Estoppel*

391.    Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

392.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

393.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

## COUNT ONE: STRICT LIABILITY FOR DEFECTIVE MANUFACTURE AND DESIGN

394.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

395.     Plaintiffs bring this strict liability claim against Defendant for defective manufacture and design.

396.     At all relevant times, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

397.     At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiffs, and/or to which the Plaintiffs were exposed, as described above.

398.     At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiffs.

399.     At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

400.     Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

Defendant, were defectively manufactured and designed by Defendant in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

401. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in manufacture, design, and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

402. At all relevant times, Defendant's Roundup® products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

403. Therefore, at all relevant times to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

b. When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

    c.      When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

    d.      Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

    e.      Defendant failed to test, investigate, or study its formulated Roundup® products.

    f.      Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

    g.      Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

    h.      Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

    i.      Defendant could have employed safer alternative designs and formulations.

404.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

405.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

406.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

would contemplate.  Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous.  Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

407.    Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

408.    As a direct and proximate result of the defective design and manufacture of Roundup® products, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages.

409.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiffs.

410.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' grave injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

411.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave injuries, and they have endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.  Plaintiffs will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

## COUNT TWO: STRICT LIABILITY FOR FAILURE TO WARN

412.     Plaintiffs incorporate by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

413.     Plaintiffs bring this strict liability claim against Defendant for failure to warn.

414.     At all relevant times, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate.  These actions were under the ultimate control and supervision of Defendant.

415.     Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, Plaintiffs' employers, Plaintiffs' co-workers, and persons responsible for consumers (such as employers), and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

416.     At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiffs of the dangers associated with Roundup® use and exposure, and a continuing duty to instruct on the proper, safe use of these products.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

417.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

418.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products.  Defendant also failed to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiffs.

419.    Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure.  The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs and Plaintiffs' employers.

420.    Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products.  Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

421.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

422.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

423.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendant.

424.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

425.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiffs to utilize the products safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed,

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

426.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

427.    To this day, Defendant has failed to test, investigate, or study its formulated Roundup® products.

428.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiffs.

429.    Defendant is liable to Plaintiffs for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

430.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

431.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein and Plaintiffs and Plaintiffs' employers could have obtained alternative herbicides.

432.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce and failing to warn Plaintiffs of the increased risk of NHL

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

associated with the use of and/or exposure to Roundup® products as described herein, Plaintiffs have developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including for medical care and treatment. Plaintiffs will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT THREE: VIOLATION OF MISSOURI MERCHANDISING PRACTICE ACT, § 407.020 et seq.

433.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

434.    At all relevant times, Defendant knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Roundup®.

435.    At all relevant times, Defendant, through its labeling, advertisements, public representations and marketing of Roundup®, intentionally used deception, fraud, false pretenses, false promises, misrepresentations and unfair trade practices in order to mislead consumers that Roundup® products are safe for use.

436.    At all relevant times, Defendant also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of Roundup® products in trade or commerce. In particular, Defendant failed to disclose to the public that Roundup® is unsafe and poses serious health hazards, particularly NHL. Defendant was aware of the hazardous risks posed by Roundup® and yet failed to inform the public of these risks through

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

their advertisements, labeling, or other means available to them. Defendant's failure to state material facts about Roundup® constitutes a violation of V.A.M.S. § 407.020.

437. At all relevant times, Plaintiffs were deceived by Defendant's intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup®.

438. At all relevant times, Plaintiffs acted in reasonable reliance upon Defendant's unlawful trade practices, and had the Defendant not engaged in the deceptive conduct described herein, Plaintiffs would not have purchased Roundup® and/or would have protected themselves from exposure to Roundup®.

439. As a direct and proximate result of Defendant's unlawful trade practices, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages.

WHEREFORE, Plaintiffs pray for judgment against Defendant in a fair and reasonable sum in excess of $10,000,000.00 together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT FOUR: NEGLIGENCE

440. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

441. At all relevant times, Defendant breached its duty to Plaintiffs and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing Roundup® products.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

442. Defendant, directly or indirectly, caused Roundup® products to be purchased and/or used by Plaintiffs.

443. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

444. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

445. At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

446. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

447. Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

448.    Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

449.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

450.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

451.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup®.

452.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so.  Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

453.   Defendant's negligence included:

a.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.      Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d.      Failing to test, investigate, or study its formulated Roundup® products;

e.      Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.      Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

g.      Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

h.      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

i.      Failing to disclose to Plaintiffs, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

j.      Failing to warn Plaintiffs, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other users or consumers;

k.      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

l.      Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

m.      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

n.      Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

    o.    Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

    p.    Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

454.    Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

455.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

456.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as described herein.

457.    Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Defendant's reckless conduct therefore warrants an award of punitive damages.

458.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT FIVE: BREACH OF EXPRESS WARRANTIES

459.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

460.    At all relevant times, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

461.    Before the time that Plaintiffs were exposed to the use of the aforementioned Roundup® products, Defendant expressly warranted to its consumers and users—including Plaintiffs and Plaintiffs' employers—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

462.    Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

463.    Defendant further failed to test, investigate, or study its formulated Roundup® products.

464.    The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

465.    Roundup® did not conform to the representations made by Monsanto as Roundup® was not safe for use by individuals such as Plaintiffs.

466.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

467.    Neither Plaintiffs nor Plaintiffs' employers could have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

468.    Defendant's breaches constitute violations of state common laws, including but not limited to, the following statutory provisions as applicable to the plaintiffs in this petition:

Ala. Code §§ 7-2-313, 7-2-314 (2017);

•    Alaska St. § 45.02.313 (effective 2016);

•    Ariz. Rev. Stat. Ann. § 47-2313 (2016);

•    Ark. Code Ann. § 4-2-313 (2016);

•    Cal. U. Com. Code § 2313(1) (2017); Cal. Civ. Code §1791.2(a) (2017).

•    Co. Rev. St. § 4-2-316 (2017);

•    Conn. Gen. Stat. Ann. § 42a-2-313 (effective 2017);

•    6 Del. C. § 2-313 (2017);

•    D.C. Code Ann. § 28:2-313 (2017);

•    Fla. Stat. Ann. § 672.313 (2017);

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

- O.C.G.A. § 11-2-318 (2017);

- Haw. Rev. Stat. § 490:2-313 (2016);

- Id. Code § 28-2-314(2)(c) (2017).

- Ill. Comp. Stat. Ann. Ch. 810, 5/2-313 (2016);

- Ind. Code Ann. § 26-1-2-313 (2016);

- Iowa Code Ann. § 554.2313 (2016);

- Kans. Stat. Ann. § 84-2-313 (2017); KRS § 355.2-318 (2017); Kan. Stat. Ann. § 60-3302(c) (2017).

- Ky. Rev. Stat. § 355.2-318 (2017);

- La. Rev. Stat. §§ 9:2800.54, 9:2800.58 (2016);

- Me. Rev. Stat. Ann. tit. 11, § 2-314 and 2-315 (2017); 14 M.R.S. § 221 (2017).

- Md. Code Ann., Com. Law § 2-318 (2017);

- Mass. Gen. Laws c. 106, § 2-313 (2017);

- Mich. Comp. Laws Ann. § 440.2313 (2016);

- Minn. Stat. Ann. § 336.2-313 through 315 (2016);

- Miss. Code Ann. § 11-1-63(i)(3) and 75-2-313 (2017);

- Mo. Rev. Stat. Ann. § 400.2-313 (2016);

- Mont. Code Ann. § 30-2-313 (2017);

- Neb. Rev. Stat. U.C.C. § 2-313 et seq. (2017)

- Nev. Rev. Stat. U.C.C. § 104.2313, et seq. (2016); Nev. Rev. Stat. §§ 104.2312-104.2318 (2016).

- N.H. Rev. Stat. Ann. § 382-A:2-313, et seq. (2017);

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

- N.M. Stat. Ann. §§ 55-2-313 to -318 (2017); *see also* UJI 13-1428 to 1433 NRMA (2016).

- N.Y. U.C.C. Law 2-313, et seq. (2017);

- N.C. Gen. Stat. Ann. § 25-2-313, et seq. (2017);

- N.D. Cent. Code § 41-02-30, et seq. (2017);

- Ohio Rev. Code Ann. § 1302.26, et seq. (2016);

- Okla. Stat. tit. 12A, § 2-313 et seq. (2017);

- Or. Rev. Stat. § 72.3130, et seq. (2016);

- 13 Pa. Stat. Ann. § 2313, et seq. (2016);

- R.I. Gen. Laws § 6A-2-313 (2016);

- S.C. Code. Ann. § 36-2-313, et seq. (2016);

- S.D. Stat. 57A-2-313, et seq. (2017);

- Tenn. Code Ann. § 47-2-313, et seq. (2016);

- Tex. Bus. & Com. Code Ann. § 2.313, et seq. (2015);

- Ut. Code Ann. § 70A-2-313, et seq. (2016);

- Va. Code Ann. § 8.2-318, et seq. (2016);

- Vt. Stat. Ann. tit. 9A, § 2-313, et seq. (2016);

- Wa. Rev. Code § 62A.2-313, et seq. (2016); § 7.72.030(2) (2016);

- W.Va. Code § 46A-6-108, et seq. (2016);

- Wis. Stat. Ann. § 402.313, et seq. (2017); and

- Wyo. Stat. § 34.1-2-313 through 315 (2017).

469.    The breach of the warranty was a substantial factor in bringing about Plaintiffs' injuries.  As a direct and proximate result of Defendant placing its defective Roundup® products

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

into the stream of commerce and failing to warn Plaintiffs of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiffs have developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including for medical care and treatment.

470.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

471.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries.  Plaintiffs have endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT SIX: BREACH OF IMPLIED WARRANTIES

472.    Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

473.    At all relevant times, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

474.    Before the time that Plaintiffs were exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users—including Plaintiffs and Plaintiffs' employers—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

475.    Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

476.    Defendant further failed to test, investigate, or study its formulated Roundup® products.

477.    Upon information and belief, Plaintiffs and Plaintiffs' employers reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

478.    Upon information and belief, Plaintiffs and Plaintiffs' employers reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

479.    The Roundup® products were expected to reach and did in fact reach consumers, users and those in proximity to users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendant.

480.    At all relevant times, Defendant was aware that consumers, users, and those in proximity of users of its products, including Plaintiffs, would use Roundup® products as marketed by Defendant, which is to say that Plaintiffs were the foreseeable users of Roundup®.

481.    Defendant intended that its Roundup® products be used in the manner in which Plaintiffs in fact used or were exposed to them and Defendant impliedly warranted each product

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

482.    In reliance upon Defendant's implied warranty, Plaintiffs used or were in proximity to the use of Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

483.    Neither Plaintiffs nor Plaintiffs' employers could have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

484.    Defendant breached its implied warranty to Plaintiffs in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.  Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

485.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

486.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries.  Plaintiffs have endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

## COUNT SEVEN – WRONGFUL DEATH

### (Plaintiff Patricia Hoffman)

487.    The Plaintiff incorporates by reference every other paragraph of this Complaint as if each were set forth herein.

488.    As a direct and proximate result of the acts and/or omissions of Defendant, as set forth herein, the Decedent named in this action used and/or was exposed to Roundup®.

489.     Subsequent to such use, Decedent developed NHL, suffered substantial pain and suffering, both physical and emotional in nature, and subsequently died.

490.    Plaintiff Patricia Hoffman, on behalf of herself and all of the next of kin of Decedent, Bernard Hoffman, is entitled to recover damages as Decedent would have if he were living, as a result of acts and/or omissions of Defendant.

491.    Plaintiff Patricia Hoffman, on behalf of herself and all of Decedent's next of kin is also entitled to recover punitive damages and damages for substantial pain and suffering caused to Decedent from the acts and/or omissions of Defendant as fully set forth herein, including without limitations, punitive damages.

492.    As a direct and proximate result of Defendant's conduct, Plaintiff Patricia Hoffman and Decedent Bernard Hoffman have been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

WHEREFORE, the Plaintiff demands judgment against Defendant, and in the alternative, request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

## COUNT EIGHT– FRAUDULENT CONCEALMENT

493.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

494.    Monsanto is estopped from asserting a statute of limitations defense because it fraudulently concealed its wrongful conduct from Plaintiffs with the intent that Plaintiffs, their employers, and other consumers and users of Roundup® would rely on such material representations.

495.    Monsanto had actual knowledge that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries. Monsanto knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

496.    Monsanto failed to conduct adequate testing of glyphosate and the Roundup® formulation.

497.    Monsanto had actual knowledge of its misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct.  Even so, Monsanto perpetuated its wrongful conduct with the intent and fixed purpose of concealing its wrongs from Plaintiffs and the public at large. Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

498.    Plaintiffs and/or Plaintiffs' employers were unaware of the falsity of these representations, acted in actual and justifiable reliance on such material misrepresentations, and were injured as a direct and proximate result.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

499.    Additionally, Monsanto knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that it had a duty to inform Plaintiffs, their employers, and the general public of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that Plaintiffs and the public would rely on Monsanto's misrepresentations.

500.    Plaintiffs did, in fact, act in actual and justifiable reliance on Monsanto's representations, and Plaintiffs were injured as a result.

501.    Monsanto, as the manufacturer of Roundup®, was in a position of superior knowledge and judgment regarding any potential risks associated with its products.

502.    Monsanto committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiffs relating to Roundup®, said breach or breaches constituting fraud because of its propensity to deceive others or constitute an injury to public interests or public policy.

503.    In breaching its duties to Plaintiffs, Monsanto used its position of trust as the manufacturer and/or distributor of Roundup® to increase sales of its products at the expense of informing Plaintiffs that use of or exposure to Roundup® carries the risk of serious illness, such as NHL.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Plaintiffs also demand a jury trial on the issues contained herein.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

## COUNT NINE – PUNITIVE DAMAGES

504.    Plaintiffs incorporate by reference every other paragraph of this Complaint as if each were set forth herein.

505.    Defendant has acted willfully, wantonly, maliciously, with an evil motive, and recklessly in one or more of the following ways:

   a.    Defendants knew of the unreasonably high risk of NHL posed by the Roundup® products before manufacturing, marketing, distributing and/or selling the Roundup® products, yet purposefully proceeded with such action;

   b.    Despite their knowledge of the high risk of NHL associated with use and/or exposure to Roundup® products, Defendant affirmatively minimized this risk through marketing and promotional efforts and product labeling;

   c.    Through the actions outlined above, Defendant expressed a reckless indifference to the safety of users of Roundup® products, including Plaintiffs.

506.    Defendant knew of the dangers and risks of Roundup® products, yet it concealed and/or omitted this information from labels and warnings contained on Roundup® products in furtherance of its knowing and willful actions.

507.    These actions were outrageous because of Defendant's evil motive or a reckless indifference to the safety of users of Roundup® products and/or those who became exposed to it.

508.    As a direct and proximate result of the willful, wanton, malicious, evilly motivated and/or reckless conduct of Defendant, the Plaintiffs have sustained damages as set forth above.

WHEREFORE, Plaintiffs pray for a judgment for punitive damages against Defendant, jointly and severally, in a fair and reasonable amount sufficient to punish Defendant and deter it

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

and others from engaging in similar conduct in the future, costs expended herein, and such further and other relief as the Court deems just and appropriate.

## COUNT TEN – DAMAGES

509.    Plaintiffs incorporate by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

510.    Defendant knew of the dangerous condition of Roundup® products, including that they posed a danger to their consumers and non-consumers exposed to Roundup® products, including Plaintiffs, but chose not to include any warnings or information regarding the dangerous condition of Roundup® products.

511.    Defendant showed complete indifference to or conscious disregard of the safety of Plaintiffs by their conduct described herein.  Defendant knew or should have known failure to include a warning for Roundup® products would result in women using and/or being exposed to Roundup® products and subsequently developing NHL.

512.    Plaintiffs are entitled to exemplary damages to punish Defendant and to deter Defendant and others in similar situations from like conduct.

WHEREFORE, Plaintiffs pray for judgment against Defendant for:

a.      compensatory damages in an amount to be proven at trial;

b.      exemplary damages;

c.      costs, including reasonable attorneys' fees, court costs, and other litigation expenses; and

d.      any other relief the Court may deem just and proper.

Electronically Filed - St Louis County - August 31, 2018 - 10:44 AM

Respectfully submitted,

**NIEMEYER, GREBEL & KRUSE LLC**

By:     */s/ Mark R. Niemeyer*
        Mark R. Niemeyer, #42437
        Michael S. Kruse, #57818
        10 S. Broadway, Suite 1125
        St. Louis, MO  63102
        314-241-1919 phone
        314-665-3017 fax
        niemeyer@ngklawfirm.com
        kruse@ngklawfirm.com

        *Attorneys for Plaintiffs*